NOT DESIGNATED FOR PUBLICATION

No. 122,687

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interest of
E.C., A Minor Child.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; KEVIN M. SMITH, judge. Opinion filed September 11, 2020. Affirmed.

*Jordan E. Kieffer*, of Dugan & Giroux Law, Inc., of Wichita, for appellant natural mother.

*Julie A. Koon*, assistant district attorney, and *Marc Bennett*, district attorney, for appellee.

Before BUSER, P.J., STANDRIDGE and WARNER, JJ.

PER CURIAM: The district court terminated Mother's parental rights to her son E.C., finding she was an unfit parent and termination best served E.C.'s interests. Mother appeals both those findings. She challenges the evidence offered to show her unfitness as a parent, highlighting recent progress she made to correct the reasons the State removed E.C. from her custody. She also contends that giving her more time to keep making progress, rather than terminating her parental rights, would best serve E.C.'s interests. But accepting those arguments would require reweighing evidence or substituting this court's opinion for the district court's reasonable exercise of its discretion—steps an appellate court cannot take. Because the district court's findings are reasonable and supported by evidence in the record, we affirm.

1

FACTUAL AND PROCEDURAL BACKGROUND

In March 2018, when E.C. was five years old, Mother and E.C. had been staying for a few months with Mother's boyfriend J.A. at his mother's house. But J.A. used crack cocaine while E.C. was in the house and had been arrested at least 11 times for domestic violence incidents, 6 of which involved Mother. After one such incident in which the police arrested both J.A. and Mother, J.A.'s mother kicked Mother and E.C. out of the house. Now homeless, Mother and E.C. returned for the fourth time to the St. Francis shelter in Wichita.

A few weeks into their stay, police arrived to investigate reports from the Kansas Department for Children and Families (DCF) that Mother was neglecting and abusing E.C. The reports alleged that Mother stayed in her room at the shelter all day without feeding E.C.; that she hit E.C. with a belt, sometimes leaving a mark; that she did not supervise E.C. when he played outside near busy streets in an unsafe area; and that she engaged in sexual activity in E.C.'s presence. DCF had received reports about Mother before. The agency had investigated allegations less than a year earlier that she slapped E.C. and left a bruise on his face, only to conclude there was not enough evidence to substantiate the reports. This time, however, police took E.C. into protective custody, and he confirmed most of the allegations in the latest reports.

Two days later, DCF petitioned to have E.C. declared a child in need of care. The district court awarded temporary custody of E.C. to DCF, who placed him with his paternal great-grandmother. After the temporary custody hearing, Mother received a case plan—a list of tasks aimed at correcting the reasons E.C. needed care and facilitating reintegration of the family. St. Francis Community Services (SFCS) prepared the plan and assigned caseworkers to help Mother complete the tasks. Under the plan, Mother had to (1) maintain stable housing and employment; (2) take parenting, budgeting, and nutrition courses; (3) complete and follow the recommendations of a clinical assessment

to address mental health issues; (4) complete a substance abuse evaluation; (5) submit and pass random drugs tests; and (6) complete domestic violence classes.

In the months that followed, the district court granted DCF's petition and adjudicated E.C. a child in need of care as to E.C.'s father, who was incarcerated. In late August 2018, the court held an evidentiary hearing and adjudicated E.C. a child in need of care as to Mother. The court ordered that E.C. remain in his great-grandmother's custody.

From that point on, the district court held a hearing every few months to assess Mother's progress on the case plan. At the first of these status hearings in October 2018, the district court found that reintegration remained a viable goal because Mother was making some progress on her tasks. But at the next hearing in March 2019, the court found reintegration was no longer viable and directed the district attorney to request either termination of Mother's parental rights or the establishment of a permanent custodian. The State filed a termination motion in July 2019.

These status hearings were not Mother's only court appearances. In the months between E.C.'s adjudication in August 2018 and the March 2019 status hearing, Mother was placed on probation three times—in August, November, and December 2018—for two instances of domestic violence stemming from her relationship with J.A. and one instance of disorderly conduct. As a condition of her probation, Mother had to attend classes at the Day Reporting Center (DRC). One class she had to take was a six-month course called the Batterer's Intervention Program. Mother never finished those classes. As a result, the court in her criminal case found she had violated her probation by not following her DRC course load and extended her probation term. And while Mother was reporting to the DRC, she tested positive for alcohol use and received a recommendation for substance abuse treatment. Mother was still on probation when the district court held a hearing in this case on the State's termination motion.

That hearing was held in December 2019. E.C. was then six years old and had been removed from Mother's custody for 20 months. The State called several caseworkers as witnesses to discuss Mother's progress on her case plan. In their view, reintegration could not occur unless Mother completed all tasks in the case plan. They testified that Mother partially completed some tasks but ignored others altogether:

- She attended four out of eight parenting classes but stopped going after J.A. would no longer give her a ride. When SFCS referred her to a different class that met on a day that she could catch a bus, Mother called about switching to that class but never attended.

- She did not take required courses in protective parenting, budgeting, and nutrition.

- Although she complied with random drug tests and never tested positive for drug use, she did not complete a substance abuse evaluation.

- She received a mental health assessment that recommended 12 therapy sessions for adjustment disorder, but she never scheduled those sessions.

One caseworker testified that it would take six to nine months for Mother to complete these tasks and implement the changes needed to allow reintegration to occur.

Mother testified that she believed she did not need parenting classes and would not benefit from therapy. She also explained that she did not complete some of the tasks above because her focus was on obtaining stable housing and employment.

4

On the housing front, Mother struggled to achieve stability. She signed a one-year lease on an apartment three weeks before the termination hearing, but it had no furniture in it when SFCS inspected it. Mother said that she had since furnished the apartment, though she had not yet scheduled another walk-through to confirm that. When SFCS arrived for the first inspection, a man named R.B. was also there. R.B. has spent about 20 years of his adult life in prison, most recently serving a sentence for aggravated battery from 1999 to 2012. In March 2016, police arrested R.B. for a domestic violence offense that the State later dismissed because the victim did not appear at a hearing.

When asked about R.B. at the termination hearing, Mother had trouble defining the relationship. At first, she appeared to confirm that her and R.B. were romantically involved at some point. Then she clarified that theirs was a "friendship relationship," before settling at last on "just friends." Mother also denied ever marrying R.B. but noted that he was future husband material. R.B. had met E.C. before but had not seen him since the case started. Mother said that she had no problem with R.B. being involved in E.C.'s life and that R.B. was an appropriate role model for E.C.

Mother testified that for about a year before leasing the apartment, she lived with a friend who charged $30 a month in rent. Before that, she lived in a homeless shelter. And before she lost custody of E.C., they lived at her mother's house, J.A.'s mother's house, and homeless shelters.

Mother similarly struggled to maintain employment. She claimed to have started a new job the week before the termination hearing as a home-health aide, where she made enough to cover rent, utilities, and expenses for her and E.C. Before that, Mother had spent short terms of employment at several jobs, with durations ranging from a few days at fast food restaurants to three months at a daycare center. She had no job for some months before she started working as a home-health aide, which she attributed to her having to take classes at the DRC as a condition of her probation. And she was

unemployed for at least three months until she started at the daycare center. The daycare center let Mother go after she failed a background check.

The caseworkers also discussed Mother's spotty visitation attendance record. Visits with E.C. were for one hour and supervised by a caseworker at SFCS's office. From early July to early September 2018, Mother attended 6 of 11 visits. Of the 43 visits SFCS scheduled since August 2018 (about five months into the case), Mother missed 13 and was late to 10. Other times, Mother left early because she said she had to go to work. SFCS offered to move visits earlier in the day so Mother could stay for the whole visit, but Mother did not accept that offer until a few months before the termination hearing. When Mother missed visits, E.C. would say things like, "I know she's not coming" and "Why are we waiting anymore?"

Mother did not visit E.C. at all from October 2018 to February 2019. After the first few absences during this period, a caseworker informed Mother by voicemail that visits would stop until Mother contacted SFCS. That same caseworker regularly contacted Mother to no avail and checked the SFCS lobby at the scheduled visitation time each week in case she showed up. Visits resumed after Mother attended a hearing in early February. She did not explain where she had been for four months.

The caseworker testified that when Mother did attend visits, she would usually engage with E.C. for the first 5 to 10 minutes before getting on her phone or putting headphones on for the rest of the hour. And she would discuss topics that the caseworkers viewed as inappropriate, such as her relationship with J.A., complaints against her caseworkers, and her belief that E.C. would come home with her soon. According to her caseworkers, Mother's demeanor during visits had worsened in the months before the termination hearing.

At the end of the hearing, the district court granted the State's motion and terminated Mother's parental rights. Citing four statutory factors in K.S.A. 2019 Supp. 38-2269, the court found that Mother was unfit to parent E.C. and was likely to remain unfit for the foreseeable future. It also found that terminating Mother's parental rights would be in E.C.'s best interests. Mother now appeals that decision.

## DISCUSSION

A parent has a constitutionally protected liberty interest in the relationship with his or her child. See *Santosky v. Kramer*, 455 U.S. 745, 753, 758-59, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982); *In re B.D.-Y.*, 286 Kan. 686, 697-98, 187 P.3d 594 (2008). Thus, before terminating parental rights, a district court must find the State has proven the parent is unfit, the conduct or condition that renders the parent unfit is unlikely to change in the foreseeable future, and termination of parental rights is in the best interests of the child. K.S.A. 2019 Supp. 38-2269(a), (g)(1). Due to the fundamental nature of this right, any findings relating to a parent's unfitness must be proved by clear and convincing evidence. K.S.A. 2019 Supp. 38-2269(a); *In re R.S.*, 50 Kan. App. 2d 1105, Syl. ¶ 1, 336 P.3d 903 (2014).

When reviewing a finding of parental unfitness, this court must determine, after considering all the evidence in a light favoring the State, whether the State proved its case by clear and convincing evidence—i.e., whether a rational fact-finder could have found it highly probable that the parent was unfit. *In re B.D.-Y.*, 286 Kan. 696, Syl. ¶ 4. We do not reweigh conflicting evidence, pass on the credibility of witnesses, or otherwise independently decide disputed questions of fact. 286 Kan. at 705.

After finding a parent unfit—both at the time of the termination hearing and for the foreseeable future—the district court must determine if termination of parental rights is "in the best interests of the child." K.S.A. 2019 Supp. 38-2269(g)(1). This assessment

7

gives "primary consideration to the physical, mental and emotional health of the child." K.S.A. 2019 Supp. 38-2269(g)(1). Because determining what is in a child's best interests is inherently a judgment call, we will only overturn a district court's best-interests determination when it constitutes an abuse of discretion. *In re R.S.*, 50 Kan. App. 2d 1105, Syl. ¶ 2. A district court exceeds the broad latitude it is afforded if it rules in a way no reasonable person would have under the circumstances, ignores controlling facts or relies on unproven factual representations, or acts outside the appropriate legal framework. *State ex rel. Secretary of DCF v. Smith*, 306 Kan. 40, 60, 392 P.3d 68 (2017).

Mother appeals the district court's findings relating to unfitness and its assessment of E.C.'s best interests. Mother argues that the State did not prove her unfitness as a parent by clear and convincing evidence, disputing each factor supporting the district court's contrary conclusion and emphasizing her recent progress in finding housing and employment. And Mother claims that E.C.'s interests would have been best served by giving her more time to finish her case plan tasks, not by terminating her parental rights. We address each of these claims in turn.

1. *The State proved Mother's unfitness by clear and convincing evidence.*

K.S.A. 2019 Supp. 38-2269 lists several nonexclusive circumstances that can render a parent unfit. The existence of any single factor may establish unfitness if proven by clear and convincing evidence. K.S.A. 2019 Supp. 38-2269(b)-(c), (f). The district court found four of the factors listed showed Mother's unfitness:

(1) The failure to rehabilitate the family (that is, reunite Mother and E.C.) under K.S.A. 2019 Supp. 38-2269(b)(7) despite reasonable efforts by the State or private agencies;

(2) Mother's lack of effort to adjust her circumstances to meet E.C.'s needs under K.S.A. 2019 Supp. 38-2269(b)(8);

8

(3) her failure to maintain regular visitation under K.S.A. 2019 Supp. 38-2269(c)(2); and

(4) her failure to carry out a reasonable reintegration plan approved by the court under K.S.A. 2019 Supp. 38-2269(c)(3).

On appeal, Mother challenges the evidence supporting each of these factors, as well as the district court's separate finding that those circumstances were unlikely to change. Importantly, Mother does not claim that *no evidence* supports the district court's findings; instead, she points to various facts that she believes undermine the court's assessment of the facts. Thus, Mother in essence is asking this court to reweigh the evidence presented at the termination hearing and come to a different conclusion. But that is not the role of an appellate court. See *In re M.S.*, 56 Kan. App. 2d 1247, 1256, 447 P.3d 994 (2019). Rather, we must determine whether, after reviewing all the evidence in the light most favorable to the State, "a rational factfinder could have found the determination to be highly probable." *In re B.D.-Y.*, 286 Kan. 686, Syl. ¶ 4.

For example, Mother asserts that the State failed to show that the governmental and private actors involved in her case engaged in reasonable efforts to reintegrate her with her son; thus, she claims, the district court erred when it relied on K.S.A. 2019 Supp. 38-2269(b)(7) as a reason for finding her unfit to parent E.C. To illustrate her claim, Mother argues that certain comments made by the district court at the temporary custody hearing indicate the court always intended to terminate her parental rights, despite her actions throughout the case. (We note, however, that six months after the temporary custody hearing, the court held a review hearing and found reintegration remained a viable option, belying Mother's argument.) She also argues that the district court at one point indicated it would hold DCF and SFCS in contempt if they failed to submit an achievement plan on time. And Mother claims that the caseworkers' testimony during the

9

termination hearing evinced a disdain for Mother and a belief that reintegration would never be possible.

But all this information was available to the district court—the judge who heard the witnesses' testimony, evaluated their credibility, and reviewed the evidence, including the procedural history of the case. And there is evidence in the record that the failure to reintegrate E.C. was not due to the others' lack of reasonable efforts, but instead stemmed from Mother's lack of communication, inability to follow through on tasks, and unwillingness to accept the caseworkers' advice and help. Viewed in the light most favorable to the State, this evidence showed a high probability that Mother—not her caseworkers—caused rehabilitation efforts to fail.

Mother also claims that the record does not support the district court's conclusion that she failed to adjust her circumstances and carry out her reintegration plan under K.S.A. 2019 Supp. 38-2269(b)(8) and (c)(3). Mother acknowledges that she did not complete all the tasks in her case plan, but she argues that the steps she did take should have been sufficient, particularly in the areas of housing and employment. Again, though, Mother's appeal asks us to reweigh the evidence rather than determine whether the record is sufficient to support the district court's findings by clear and convincing evidence.

The record shows that although Mother started a few tasks in her reintegration plan, she never finished them. She attended four parenting classes but skipped the other four; she passed all her drug tests but never completed a substance abuse evaluation; she completed a mental health assessment but did not attend therapy. And she made no progress on other tasks, like taking budgeting and nutrition courses. The evidence relating to her housing and employment, which Mother viewed as most important, do not compel a different outcome. The evidence at the termination hearing showed that Mother leased an apartment less than a month before the hearing, and it had no furniture when SFCS inspected it. Her previous living arrangements—living with a friend and in a homeless

shelter—did not provide a stable environment for a young child. And in 2019 alone, she switched jobs five times and obtained her latest position only a week before the termination hearing; she was unemployed from March to late June and from late September to mid-November. The record supports the district court's conclusion that the State proved by clear and convincing evidence that Mother had not completed her reintegration plan.

There is likewise sufficient evidence that Mother did not adjust her circumstances to meet E.C.'s needs. One reason DCF removed E.C. was because of Mother's abusive relationship with J.A., who used crack cocaine around E.C. Yet their relationship continued well after E.C.'s removal, as shown by Mother's two arrests six months later for domestic violence incidents involving J.A. Those arrests led to probation, and Mother now faces a potential prison sentence because she has not completed a course required as a condition of her probation. Mother did testify that she ended the relationship and had not seen J.A. in over a year. We commend Mother for taking that important step. But the State put on evidence that she had potentially started a new relationship with R.B., who has a history of arrests for domestic violence. This evidence—along with the evidence relating to Mother's inability or unwillingness to comply with the case plan—supports the district court's conclusion that Mother had not adapted her life to allow her to parent E.C.

And Mother's attempts to undermine the district court's findings under K.S.A. 2019 Supp. 38-2269(c)(2) (failure to maintain regular visitation) by claiming she attended most of the scheduled visits from August 2018 forward are similarly without merit on appeal. Mother argues that she attended 75% (33 of 43) of scheduled visits since August 2018. But that figure is misleading, as it omits the four-month period in which SFCS stopped scheduling visits because Mother stopped attending them. And caseworkers' testimony at the termination hearing indicated Mother arrived late to many visits, left several others early, and often spent more time on her cell phone during visits than she

11

did interacting with her son. The district court's findings that Mother was unfit to parent E.C. at the time of the termination hearing are supported by evidence in the record.

Finally, Mother argues that there was not sufficient evidence to support the district court's conclusion that the circumstances that rendered her unfit as a parent would remain unchanged for the foreseeable future. See K.S.A. 2019 Supp. 38-2269(a). Mother emphasizes that she testified about her willingness to complete the case plan and her desire to have E.C. with her. Mother asserts that these factors, when viewed in light of the steps she already had taken, undermine the district court's findings.

Two principles guide our consideration of this issue. First, courts measure the foreseeable future from the perspective of a child, not of the parent. See K.S.A. 2019 Supp. 38-2201(b)(4). We do so because children perceive time differently than adults; to a young child like E.C., for example, "a month or a year [might] seem considerably longer than it would for an adult." *In re M.S.*, 56 Kan. App. 2d at 1263. Second, in assessing the likelihood that the circumstances that make a parent unfit will change, courts may "look to the parent's past conduct as an indicator of future behavior." 56 Kan. App. 2d at 1264.

While we understand Mother's desire to continue to parent E.C., her statements do not compel a different conclusion than that reached by the district court:

> "A parent may be labeled 'unfit' under the law even though he or she loves the child and wants to do the right thing, which may be the case here. But we must judge these cases based mostly upon actions, not intentions, and we must keep in mind that a child deserves to have some final resolution within a time frame that is appropriate from that child's sense of time." *In re A.A.*, 38 Kan. App. 2d 1100, 1105, 176 P.3d 237, *rev. denied* 286 Kan. 1177 (2008).

Applying these principles here, the State showed that it was highly probable that Mother would remain unfit for the foreseeable future. Mother's past actions, even in the months before the termination hearing, supported a finding that her circumstances were unlikely to change. In the three months before the hearing, her poor visitation habits continued—she missed some visits without explanation, arrived late and left early, and would not engage with E.C. when she did show up. At the hearing, she testified that she did not need parenting, budgeting, or nutrition classes that her caseworkers viewed as vital to correct the behavior that led to E.C.'s removal. And she had only recently secured an apartment and a job. In sum, there is sufficient evidence in the record to support the district court's findings that Mother was presently unfit to parent E.C. and that these circumstances were unlikely to change in the foreseeable future. The State proved Mother's present and future unfitness by clear and convincing evidence.

2. *The district court did not abuse its discretion in finding that E.C.'s interests are best served by terminating Mother's parental rights.*

Mother also argues that even if sufficient evidence supported an unfitness finding, the district court erred in finding that E.C.'s interests are best served by terminating her parental rights. In making this argument, Mother alleges no legal or factual error by the district court; she instead notes that E.C. had lived with Mother most of his life and was bonded to her. She asserts that the district court should have ordered a less drastic course than termination and allowed her more time to complete the reintegration tasks. That is, Mother argues that the district court abused its discretion when it found that termination was in E.C.'s best interests.

When the termination hearing occurred, E.C. was almost seven years old and had been living with his great-grandmother for almost two years. A caseworker testified that E.C. is "thriving" in that environment, surrounded by a close-knit family. At the same time, the State raised valid concerns about whether Mother could provide a similarly stable and safe environment for E.C. Although Mother expressed a willingness to

13

complete the rest of her case plan tasks and to address those concerns, the State presented evidence that it would take at least an additional six to nine months—with no intervening setbacks—for her to do so. In light of this record, the district court's assessment of E.C.'s best interests was reasonable and consistent with the evidence. The court did not abuse its discretion in terminating Mother's parental rights.

Affirmed.